Hart Metal Products Corporation v. Commissioner.
Hart Metal Products Corp. v. Commissioner
Docket No. 4777-66.
United States Tax Court
T.C. Memo 1969-164; 1969 Tax Ct. Memo LEXIS 129; 28 T.C.M. (CCH) 810; T.C.M. (RIA) 69164; August 13, 1969. Filed *129 Held, that the petitioner has failed to prove that the respondent erred in determining that the principal purpose for the acquisition of control of petitioner on February 29, 1960, was the evasion or avoidance of Federal income tax by securing to the acquirer the benefit of a deduction of petitioner's claimed net operating losses and in therefore disallowing the deduction of such claimed losses under section 269 of the Internal Revenue Code of 1954. Held further, that the petitioner has failed to prove that it is entitled to a claimed long-term capital loss for the taxable year ended September 30, 1961, and resulting claimed capital loss carryovers to its taxable years ended September 30, 1962, 1963, and 1964. Held further, that petitioner has failed to establish that for any of the taxable years in question it is entitled to deductions on account of depreciation of patents. Held further, that petitioner was a personal holding company for each of its taxable years ended September 30, 1961, 1963, and 1964. Held further, that in computing petitioner's undistributed personal holding company income for its taxable years ended September 30, 1961, 1963, and 1964, respondent did not err *130 in failing to allow as a deduction any Federal income taxes for such years since such taxes are contested herein and therefore cannot be considered as having accrued in such years within the meaning of section 545(b)(1) of the Code. Held further, that the doctrine of collateral estoppel does not apply with respect to any issues as a result of a decision of no deficiency entered by this Court in a case for a prior year involving similar issues, where such decision was entered pro forma upon the basis of an agreement of the parties to settle the case for reasons undisclosed. John L. Carey, 645-695 First Bank Bldg., South Bend, Ind., for pet itioner Wayne Chertow, for respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax against petitioner as follows: Year Ended
Income Tax [1]
September 30, 1961
$ 69,438.38
September 30, 1962
13,410.76
September 30, 1963
$30,666.63
September 30, 1964 25,881.92
$139,397.69 The issues presented *131 are: (1) whether the petitioner is entitled for each of the taxable years in question to claimed net operating loss deductions; (2) whether 811 petitioner is entitled to a capital loss deduction claimed for the taxable year ended September 30, 1961 and capital loss carryovers to the other taxable years in question on account thereof; (3) whether petitioner is entitled to patent amortization deductions claimed for each of the years in question; (4) whether petitioner was a personal holding company during any of the taxable years in question and, if so, whether respondent's computation of personal holding company tax is correct; and (5) whether the doctrine of collateral estoppel applies to issues (1) and (3). Findings of Fact Some of the facts were stipulated and the stipulations are incorporated herein by this reference. The petitioner, Hart Metal Products Corporation, was incorporated under the laws of Indiana on July 22, 1952, to engage in a general industrial and manufacturing business. Its sole stockholder was Thur Schmidt who acquired 255 shares of petitioner's common stock for $25,500 cash. Shortly thereafter petitioner acquired all the stock of Hart Pressed Steel Corporation *132 from one Hartnell, issuing to Hartnell a promissory note in the principal amount of $400,000 with interest at 5 percent. Hart Pressed Steel Corporation was then liquidated and the petitioner acquired all its assets, including a manufacturing plant at 3306 Hammond Avenue, Elkhart, Indiana, having an area of 130,000 to 140,000 square feet. Petitioner gave Hartnell a mortgage upon the real estate acquired to secure the payment of the $400,000 note. Thereafter the petitioner conducted on the property thus acquired the business of making metal stampings, fabrications, and dies. It also processed metal products for the defense industry, primarily aircraft parts. During the years following its incorporation, petitioner prospered and by September 30, 1956, it had an earned surplus of $293,149.71. However, business began to decline in 1957 and the petitioner's defense business became nil. The petitioner on its return for the taxable year ended September 30, 1957, reported a net operating loss of $472,495.04. At some time in the latter part of 1967 Frank Fernholz and certain other individuals associated with him purchased from Schmidt all the outstanding stock of petitioner, and became the directors *133 of the petitioner. These individuals had previously purchased from Schmidt over 80 percent of the stock of Metal Glass Products Co. (hereinafter referred to as Metal Glass), a corporation engaged in Belding, Michigan, in the manufacture of stainless steel tanks for all types of processing industries, such as dairy, beverage, ice cream, cosmetic, textile, food processing, pharmaceutical and chemical. On February 28, 1958, petitioner rented a portion of its plant on Hammond Avenue to Metal Glass under a three-year lease for a monthly rental of $1,750. On March 19, 1958, such lease was superseded by a new lease whereby the petitioner leased the entire plant and all the machinery and equipment which it still owned to Metal Glass at a rental of $8,250 per month. Subsequent to such date, petitioner engaged in no manufacturing activities, and has never since had any employees or paid any salaries. After entering into the lease with petitioner, Metal Glass moved its equipment and inventories to the Hammond Avenue plant which it had leased, and continued to manufacture its own line which it combined with the manufacturing processes of petitioner. Metal Glass acquired petitioner's inventories *134 of material and work in process, for which it gave a promissory note dated April 1, 1958, in the amount of $109,653.98 and assumed an obligation of petitioner to a bank in the amount of $50,000. In its return for the taxable year ended September 30, 1958, the petitioner reported inventory at the beginning of the year of $147,676.71, material purchases and labor of $353,054.51, no inventory at the end of the year, cost of goods sold of $500,731.22, gross sales of $615,060.86, and gross profit from sales of $114,329.64. On August 11, 1958, Metal Glass filed a petition with the United States District Court for the Northern District of Indiana, South Bend Division, for a Chapter 11 reorganization under the Federal Bankruptcy Act. In its petition, Metal Glass alleged that it was not insolvent but was unable to pay debts as they matured, and that certain "threatened litigation is imminent against the company." Several arrangements were filed by Metal Glass in the Chapter 11 proceedings. The court, by order dated January 5, 1959, confirmed the third amended arrangement filed in the proceedings. This arrangement provided, among other things, that the management of Barler Metal Products, Inc., *135 would acquire the majority of the capital stock of 812 Metal Glass, paying nothing for such stock. This stock transfer was made to induce Barler Metal Products, Inc., to render its executive and management services without charge to Metal Glass until such time as the claims of the unsecured creditors listed in "Class IV" were paid at 60 cents on the dollar. Petitioner's claim (then in the sum of $108,162.31) was listed in "Class V" subordinate to the claims listed in all other classes, and no provision was made for its payment. On December 31, 1958, five days prior to the confirmation of the above arrangement, the petitioner had acquired, at no recorded cost, 253 of its outstanding 255 shares of stock, leaving 2 shares outstanding. On the same date such 2 remaining shares were purchased by Barler Metal Products, Inc. The record does not show the purchase price. On March 26, 1959, petitioner transferred its machinery and equipment, and office equipment, to Metal Glass, the latter assuming a chattel mortgage in the amount of $108,972.20 with respect thereto. Metal Glass issued to petitioner 625 shares of Metal Glass preferred stock which were recorded, and carried on petitioner's balance *136 sheets, at an amount of $53,700.92. Such amount represented the net equity of the assets transferred as computed by subtracting from the net depreciated cost of such assets the indebtedness thereon which had been assumed by Metal Glass. In its return for the taxable year ended September 30, 1959, the petitioner reported a sale of "Machinery and equipment" with a depreciated cost of $131,699.61, to Metal Glass at a gross sales price of $131,699.61, resulting in no reported gain or loss. It also reported a sale of "Machinery" to Metal Glass for $4,300, resulting in a claimed loss of $2,269.32. On November 6, 1959, a proposal to alter the existing arrangement in the Metal Glass Chapter 11 proceedings was filed in the district court. About December 1959 Monroe Coblens, who resided in Sarasota, Florida, learned that Metal Glass was for sale. Coblens had for many years been operating filter manufacturing companies, and at that time he owned a filter manufacturing company, Hormann Seitz Manufacturing Company, which operated in Newark, New Jersey. He also owned all the stock of a corporation known as Republic Filters, Inc. , which at one time had been in the filter manufacturing business *137 but which for a number of years had been a holding company. Such corporation will be referred to hereinafter. Upon learning that Metal Glass was for sale Coblens contacted Marion Miller, the president of Barler Metal Products, Inc., who informed him that Barler Metal Products, Inc. did not have the funds available to carry out the arrangement which had been approved by the bankruptcy court and that if he could supply the funds Metal Glass needed Barler Metal Products, Inc. would sell its interest in Metal Glass at a modest price and Coblens could take Metal Glass out of Chapter 11 bankruptcy. The offer made by Barler Metal Products, Inc. was a "package" offer which also included the sale of the stock of the petitioner. Coblens was not interested in purchasing Metal Glass alone. On January 13, 1960, Coblens entered into an agreement with Barler Metal Products, Inc. for the purchase, for $13,385, of all the stock of petitioner (2 shares) and 166,640 of the 206,543 outstanding shares of common stock of Metal Glass. The agreement provided in part as follows: III. Barler Agrees. * * * K. Barler warrants and agrees that it will not cause Metal-Glass and/or Hart to file a consolidated return *138 with itself or any other corporation. Barler further warrants that it has not taken nor will it take any action which has affected or may affect the rights of Metal-Glass and/or Hart to carry forward their respective net operating losses to the extent permitted by the Internal Revenue Code. * * * V. Coblens Agrees. * * * B. That if the alteration proposed to the third amended arrangement is approved by the District Court for the Northern District of Indiana, he will, within sixty (60) days from said confirmation, make funds available to Metal-Glass to enable it to pay twenty-five and one-half cents (25 1/2") on each original one dollar ($1.00) of general unsecured indebtedness under paragraph 4 of Article III of the Third Amended Arrangement. C. That he will cause Metal-Glass, within thirty (30) days after closing, to reimburse Barler in the amount of Five Thousand, Five Hundred Dollars ($5,500.00) for money spent by Barler as agent for Metal-Glass. 813
D. That he will cause Metal-Glass to pay, within thrity (30) days after closing, any accounts payable then due and owing from Metal-Glass to Barler. E. That he will cause Metal-Glass, within thirty (30) days after closing, to pay the *139 Seven Thousand Dollar ($7,000.00) management fee hereinafter set forth. VI. Conditions of Purchaser's Obligations. All obligations of Coblens under this agreement are subject to fulfillment, prior to or at the closing, of each of the following conditions: A. An agreement with Bell Aircraft that its second mortgage in the amount of One Hundred Nine Thousand, Three Hundred Thirty and 67/100 Dollars ($109,330.67) can be purchased by Coblens for Forty-two Thousand, Five Hundred Dollars ($42,500.00) or less. * * * C. Receipt of an assignment to Coblens from Carleton M. Tower of a note from Metal-Glass in the amount of Fifty Thousand Dollars ($50,000.00) along with a general release by Mr. Tower to both Metal-Glass and Hart. D. Receipt of an assignment to Coblens from Frank Fernholz, Alfred J. Borah, William B. Goodstein and Carleton M. Tower of their notes, from Hart, in the respective amounts of Twenty-six Thousand, Three Hundred Dollars ($26,300.00), Fifty-four Thousand Two Hundred Dollars ($54,200.00), Twelve Thousand Dollars ($12,000.00) and Thirteen Thousand, Two Hundred Dollars ($13,200.00) along with general releases from each of the above named individuals to Hart and Metal-Glass. *140 * * * IX. Mutual Agreements. The parties mutually agree: A. That Barler will manage for a fee of Seven Thousand Dollars ($7,000.00), Hart and Metal-Glass in the interim period between the confirmation of this agreement by the District Court of the United States for the Northern District of Indiana, South Bend Division, and the date when Coblens takes personal charge of the operation. * * * On February 29, 1960, the bankruptcy court entered an order confirming the alteration to the third amended arrangement. Therein the court recognized that Coblens on behalf of Metal Glass would make the necessary deposits required under the alteration to the arrangement and authorized Coblens to succeed to the management and control of Metal Glass. On the same date Coblens purchased from Barler Metal Products, Inc. the 166,640 shares of common stock of Metal Glass and the 2 outstanding shares of common stock of petitioner in accordance with the agreement to purchase. The bills of sale recite a consideration of $13,185 for the Metal Glass stock and $200 for the stock of petitioner. After Coblens became sole stockholder of petitioner he changed its officers and directors and designated himself chairman *141 of the board. Pursuant to his commitment, he arranged for Metal Glass to obtain a loan of about $80,000 from Northern Trust Company, Chicago, Illinois, which he personally guaranteed and secured by his personal security. On November 19, 1960, the bankruptcy proceedings were terminated and the case was dismissed. Coblens proceeded to operate Metal Glass, but the operations were not successful due to the fact that the company had shipped products with inferior workmanship, mostly before Coblens took over, and the fact that the company had lost its better representatives. At about the beginning of 1961 Metal Glass had labor troubles which lasted two or three weeks and caused the company to sustain large losses. Coblens indicated to David McNitt, comptroller and treasurer of Metal Glass, that he desired to sell his stock in that company. McNitt offered $1 for such stock but Coblens refused the offer because McNitt was unable to add working capital to the company. At this time the petitioner was still receiving from Metal Glass rental on its building at the rate of $3,600 per month, the rate which had been fixed by the court when Metal Glass was in the bankruptcy proceedings. In May 1961, *142 Metal Glass was recapitalized. Under the plan of recapitalization each 1,000 shares of common stock outstanding was replaced with 1 share of new common stock, each $100 of preferred stock outstanding was replaced by 5 shares of new common stock, and each $100 of notes outstanding was replaced by 10 shares of new common stock. The petitioner surrendered the preferred stock of Metal Glass which it carried on its books at $53,700.92 and the note of Metal Glass then in the amount of $106,771.11, receiving 13,802 shares of new common stock of Metal Glass, and thereby obtained the majority interest in Metal Glass. Since Coblens owned 166,640 shares of common, presumably he thereafter owned about 166 shares of the new common stock. Thereafter the business of Metal Glass continued to deteriorate. Coblens 814 attempted, through advertising and through brokers, to find a buyer for the common stock of Metal Glass. He was unable to find a buyer, but Thur Schmidt was willing to take over the business. On September 29, 1961, petitioner sold its common stock in Metal Glass to Schmidt for $1. At that time Coblens also sold his common stock in Metal Glass to Schmidt for $1, and agreed to continue his *143 guarantee of the obligation, then in the amount of about $50,000, of Metal Glass to Northern Trust Company, and to continue to secure the obligation with his personal collateral. At that time Metal Glass was still an operating company, and continued in business under the name of Schmidt Metal Products until February or March 1963 when its equipment was seized and sold upon foreclosure of a chattel mortgage. About $300,000 was realized upon the chattel mortgage sale. The equipment sold consisted principally of the equipment which Metal Glass had originally received from petitioner in return for 625 shares of preferred stock of Metal Glass. Northern Trust Company called its loan which Coblens was required to satisfy. On February 29, 1960, when Coblens acquired the stock of petitioner, he owned all the stock of Republic Filters, Inc., hereinafter referred to as Republic. Republic had originally been engaged in manufacturing filters, but at this time had not been engaged in such business for several years. It had been a personal holding company for a considerable number of years. In its Federal income tax returns for the taxable years ended January 31, 1957 through 1961 Republic had reported *144 listed stocks and total assets as of the end of each of such years as follows: Year
Listed Stocks
Total Assets
1957
$418,551.50
$439,666.51 l1958
442,211.74
499,954.16
1959
511,533.46
555,676.92
1960
551,754.57
578,021.22
1961
538,848.64
574,638.91
In its returns for such taxable years Republic had reported the following: Year
Net CapitalGains
DividendIncome
Inc ome SubjectTo Tax
Tax Liability
1957
$ 835.25
$23,989.00
$ 3,016.59
$ 863.21
1958
158,110.90
26,535.27
161,495.88
40,549.35
1959
101,891.86
25,827.57
104,318.68
26,201.02
1960
48,681.51
28,718.25
47,675.22
12,170.38
1961
125.81
32,192.32
4,443.44
1,024.13
On February 28, 1961, a merger of the petitioner and Republic was effected, the petitioner being the surviving corporation. Coblens was president and treasurer of the petitioner. As of that date the assets of Republic were as follows: Cash
$ 2,555.48
Accounts Receivable
881.62
Notes Receivable
32,500.00
Investments
540,737.98
Accrued Interest
116.60
Deposit 180.00
Total
$576,971.68 Shortly after the merger petitioner began selling some oerger. During the years immediately preceding 1960 Coblens received salary income in the approximate amount of $30,000 per year from companies other than Republic. He also received dividends from Republic *145 and to some extent dividends from other companies. He was familiar with the tax consequences to Republic of any failure to distribute personal holding company income and as a consequence a substantial portion of such income was paid to him as dividends. Coblens customarily prepared his own individual income tax returns with the advice of an attorney and an accountant. In its return for each of the taxable years ended September 30, 1961 through 1964 the petitioner claimed a deduction of $1,476 as "patent amortization". On its books and records at the time Coblens purchased its stock petitioner carried patents, one of which was identified as being for a specially designed wheelbarrow, at an original cost of $25,000 and a depreciated cost of $12,460.50. Prior to that time the petitioner had claimed depreciation at such rate of $1,476 per year. In its income tax return for the taxable year ended September 30, 1961, the petitioner reported a long-term capital loss of $160,471.03 on the sale on September 29, 1961, of the 13,802 shares of common stock of Metal Glass for $1. It was stated that such shares had been acquired on March 31, 1959, at a cost of $160,472.03. The application of this *146 loss, plus certain other 815 relatively small capital losses, resulted in the reporting of a net capital loss for that year of $70,244.68. Such net capital loss was carried over as a net short term capital loss in its returns for each of the taxable years ended September 30, 1962, 1963, and 1964. It was so applied in reduction of capital gain in such years to the extent of $3,887.14, $46,150.47, and $20,207.07, respectively. The petitioner reported net operating losses for the taxable years ended September 30, 1957, 1958, and 1959 in the respective amounts of $472,495.04, $138,061.92, and $37,581.66. Of the net operating loss of $472,495.04 claimed for the taxable year ended September 30, 1957, a total of $422,406.46 was carried back by the petitioner to the taxable years ended September 30, 1955 and 1956. The remaining portion ($50,088.58) was carried over by petitioner to the taxable years ended September 30, 1960, [2] *147 1961, and 1962 and deducted in those years to the extent of $15,932.59, $14,182.62, and $19,973.37, respecitively. The *148 net operating loss reported for the taxable year ended September 30, 1958, was carried over and deducted by petitioner in the taxable years ended September 30, 1962 and 1963 to the extent of $10,967.27 and $18,705.04, respectively. The remaining unused portion ($108,389.61) of such reported net operating loss was not available for further carryover because of the statutory 5-year limit on carryovers. The net operating loss reported for the taxable year ended September 30, 1959, was carried over and deducted by petitioner in the taxable year ended September 30, 1964. The petitioner's returns for the taxable years ended September 30, 1961, 1962, 1963, and 1964 disclosed the following: *10 Taxable Years Ended
Sept. 30, 1961
Sept. 30, 1962
Sept. 30, 1963
Sept. 30, 1964
Gross Income:
Dividends
$ 12,432.44
$ 24,309.72
$ 18,091.43
$ 28,680.14
Interest
6,123.33
20,305.30
15,608.53
8,875.00
Rents
43,200.00
50,925.01
37,943.33
50,190.98
Net Capital Gains
* 0
* 0
* 0
* 10,984.88
Other Income 101.58
0
0
0
Total Income
$ 61,857.35
$ 95,540.03
$ 71,643.29
$ 98,731.00
Deductions other than Net Operating Loss Deduction:
$ 47,674.73
$ 64,599.39
$ 52,938.25
$ 61,811.69
Income subject to Tax before Net Operating Loss Deduction
$ 14,182.62
$ 30,940.64
$ 18,705.04
$ 36,919.31
Net Operating Loss Deduction
$209,799.57
$195,616.95
$164,676.31
$ 37,581.66
Income Subject to Tax
($195,616.95)
($164,676.31)
($145,971.27)
($662.35)
Income Tax
None
None
None
None
*149 817 In its income tax returns filed for the taxable years ended September 30, 1961 and 1962, the petitioner stated its principal business activity as "Rentals and Investments." In its return for the taxable year ended September 30, 1963, it stated its principal business activity as "holding company," but did not furnish any statement of personal holding income and did not report any personal holding company tax due. In its return for the taxable year ended September 30, 1964, it again stated its principal business activity as "holding company," reported personal holding company income of $118,938.07, but reported no personal holding company tax *150 due. In the notice of deficiency which was addressed to the petitioner on June 21, 1966, the respondent disallowed for each of the taxable years ended September 30, 1961, 1962, 1963, and 1964 the net operating loss deduction claimed "in accordance with the provisions of sections 172, 269, and 382 of the Internal Revenue Code, as well as for your failure to substantiate the amount of the claimed deduction." The respondent also disallowed the longterm capital loss of $160,471.03 claimed by the petitioner for the taxable year ended September 30, 1961, on account of the sale of 13,802 shares of Metal Glass common stock, resulting in a determination by the respondent that the petitioner had net capital gains in the amount of $90,226.35 for that year. Accordingly, the respondent for each of the taxable years ended September 30, 1962, 1963, and 1964 disallowed the capital loss carryovers claimed by the petitioner on account of the claimed loss in 1961 from the sale of the Metal Glass common stock, and increased reported net capital gains for those years correspondingly. The respondent also disallowed for each of the taxable years in question the amount of $1,476 claimed by the petitioner *151 as a deduction for patent amortization, "in accordance with the provisions of sections 167 and 269 of the Internal Revenue Code." In the notice of deficiency the respondent determined that for the taxable year ended September 30, 1961, the petitioner had rental income of $51,002.66, rather than $43,200, as reported in its return for that year. In such notice the respondent determined that legal expenses claimed as deductions for the taxable years ended September 30, 1961 and 1963, in the respective amounts of $233.31 and $3,826.28 were allowable only to the extent of $32.19 and $3,626.28 "in accordance with the provisions of sections 162 and 269 of the Internal Revenue Code." In the notice the respondent also disallowed $304.06 of the amount of $7,926.73 claimed as a deduction by the petitioner in its return for the taxable year ended September 30, 1962, as taxes paid, and disallowed $92.63 of the amount of $1,608.65 claimed by the petitioner in its return for the taxable year ended September 30, 1963, as taxes paid. The respondent also determined that the petitioner was a personal holding company as defined by section 542 of the Internal Revenue Code and determined deficiencies in *152 personal holding company tax for the taxable years ended September 30, 1961, 1963, and 1964. In his determination of petitioner's undistributed personal holding company income for those taxable years, the respondent did not allow as a deduction any Federal income taxes for those years. Nor did he allow any deduction on account of dividends received stating that such a deduction is "not allowable in accordance with section 545 of the Internal Revenue Code." Opinion Preliminarily we will consider the issue raised by the petitioner that for the taxable years in question the respondent is collaterally estopped with respect to the issues relating to net operating loss deductions and deductions on account of amortization of patents. The basis of the petitioner's contention is the fact that in asserting a deficiency for the taxable year ended September 30, 1960 (a year not presently before us), the respondent disallowed net operating loss deductions resulting from carryovers of claimed net operating losses from the taxable years ended September 30, 1957, 1958 and 1959, and also disallowed patent amortization deductions; that similar deductions are in question in the years before us; that *153 the petitioner filed a petition with this Court putting in issue the entire deficiency for the taxable year ended September 30, 1960; and that this Court entered a decision that there was no deficiency for the taxable year ended September 30, 1960. There is no merit in this contention of the petitioner. It is well settled that a judgment is conclusive in an action only as to matters actually litigated and determined in the prior action and that where 818 a decision of this Court constitutes only a pro forma acceptance of an agreement between the parties to settle their controversy for reasons undisclosed, there has been no such determination as is required for the application of the doctrine of collateral estoppel. United States v. International Bldg. Co., 345 U.S. 503. In the prior case no trial or argument was had and no stipulations of facts or briefs were filed. Our decision of no deficiency was entered pro forma upon the basis of an agreement of the parties to settle the case for reasons undisclosed. Accordingly, the doctrine of collateral estoppel has no application here. The respondent contends that the petitioner is not entitled to net operating loss deductions for its taxable *154 years ended September 30, 1961, 1962, 1963, and 1964 resulting from carryovers by petitioner of claimed net operating losses for its taxable years ended September 30, 1957, 1958, and 1959, relying upon sections 269 and 382(a) of the Internal Revenue Code of 1954, [3] *155 *156 *157 and the principle of Libson Shops v. Koehler, 353 U.S. 382. The petitioner contends that it is entitled to such net operating loss deductions pursuant to the provisions of section 172 of the Code. [4] *158 It contends that no person acquired control of the petitioner for the principal purpose of 819 tax avoidance or evasion of tax and that hence section 269 of the Code is not applicable. It further contends that section 382(a) of the Code is not applicable under the circumstances of this case and that the principle of the Libson Shops case is not applicable since it arose under the Internal Revenue Code of 1939. Section 269(a) provides that if any person acquires control of a corporation and the principal purpose [5] *159 for which such acquisition was made is avoidance or evasion of Federal income tax by securing the benefit of a deduction, credit or other allowance which such person or corporation would not otherwise enjoy, then the Secretary or his delegate may disallow such deduction, credit or other allowance. Control of the petitioner was acquired by Coblens on February 29, 1960. The petitioner and Republic, Coblens' whollyowned personal holding company, entered into a statutory merger on February 28, 1961, the petitioner being the continuing corporation. Upon the merger the petitioner acquired all the assets of Republic, consisting principally of securities in the amount of about $540,000 and notes receivable of $32,500 and thereafter carried on the business previously carried on by Republic which generated income consisting of capital gains, dividends, and interest in the taxable years ended September 30, 1961 through 1964, in the respective amounts of $108,782.12, $48,502.16, $79,850.43, and $68,747.09. After the merger petitioner continued to rent the Hammond Avenue property and reported receiving rentals in those taxable years in the respective amounts of $43,200, $50,925.01, $37,943.33, and $50,190.98 (the net income from this source after deducting depreciation, mortgage interest, and real estate taxes being *160 approximately $9,700, $8,800, $5,900, and $20,700, respectively). In its returns for the taxable years ended September 30, 1961 through 1964 the petitioner claimed as deductions sufficient amounts of its claimed net operating losses from its taxable years ended September 30, 1957, 1958, and 1959 to offset its reported income remaining after other claimed deductions. The respondent's determination that the principal purpose for the acquisition of control of the petitioner was the avoidance or evasion of tax is presumed to be correct and the petitioner has the burden of proving that such was not the principal purpose. The Swiss Colony, Inc., 52 T.C. 25, and cases cited therein. Furthermore, section 269(c) provides that the fact that the consideration paid upon an acquisition of control of a corporation by any person is substantially disproportionate to the sum of the adjusted basis of the corporation's property and the tax benefits not otherwise available to such person, shall constitute prima facie evidence of the proscribed purpose. Reference to the legislative history of section 269(c) discloses that "disproportionate" as it is used here refers to the situation where the consideration *161 paid is substantially less than the adjusted basis of the corporate property together with the tax benefits. S. Rept. No. 1622, 83d Cong., 2d Sess., p. 228, [6] and section 1.269-5 of the Income Tax Regulations.[7] *162 820 Coblens acquired the stock of both the petitioner and Metal Glass in a single transaction. In the agreement of purchase the consideration was not allocated between the two. The recited consideration paid for the stock of both companies was $13,385 but the bills of sale recited that $200 was paid for the stock of petitioner and $13,185 for the stock of Metal Glass. In the contract Coblens also undertook to make certain funds available to satisfy in part claims of creditors of Metal Glass. Even if we were to allocate as consideration paid for the stock of the petitioner the entire amount paid for the stock of the two companies ($13,385) and *163 the $50,000 obligation of Metal Glass which Coblens was ultimately called upon to pay under his guarantee of obligations of Metal Glass the consideration would still be clearly disproportionate to the sum of the tax benefits available upon the acquisition of petitioner ($225,732.16 in claimed net operating losses) and $255,251.05 representing the adjusted basis of petitioner's property. Accordingly, it is clear that the prima facie presumption of section 269(c) is applicable in the instant case. It is the contention of the petitioner that Coblens acquired control of petitioner for a valid business purpose. In support of this contention Coblens testified that it was his intention to return Metal Glass to its prior successful position as a stainless steel tank supplier and to combine with it a filter manufacturing company which he was then operating in New Jersey, and thereby reduce his overhead. He also stated that one of his reasons for such a merger was to have the representatives of Metal Glass also represent such filter company. He stated that he would not have been interested in purchasing Metal Glass without petitioner because petitioner owned the property which Metal Glass utilized *164 in its operations. He further stated that he thought that in this way he would have a profitable company in Metal Glass and at the same time have a good investment in petitioner because of its assets, namely, its plant and the note and preferred stock of Metal Glass. He further testified, however, that in operating Metal Glass he discovered that that company had shipped products of inferior workmanship, "mostly" before he assumed control, that as a consequence the name of Metal Glass had been tarnished and it had lost its best representatives, and that those remaining were selling to a poor class of trade which did not pay its bills very well. He stated that he did not want such representatives to represent his New Jersey filter company and that therefore he decided not to combine such company with Metal Glass. The petitioner thus seeks to prove that Coblens' acquisition of control was for a business purpose closely related to a business purpose for acquiring Metal Glass. We do not doubt that Coblens did acquire Metal Glass for the business purpose of attempting to make a success thereof and that he had a business purpose in acquiring petitioner in order to control the building which *165 petitioner owned and which was used in the business of Metal Glass. However, the question presented is whether petitioner has shown that Coblens' principal purpose in acquiring control of petitioner was such business purpose, or whether the principal purpose was the avoidance of tax by securing the benefit of the claimed net operating losses of petitioner for prior years which would not otherwise be available to him. The judicial ascertainment of a person's subjective purpose is frequently difficult. The determination of the purpose for which an acquisition was made necessarily requires a scrutiny of the entire transaction or course of conduct with all its surrounding circumstances. See S. Rept. No. 627, 78th Cong., 1st Sess., p. 59, and Army Times Sales Co., 35 T.C. 688. At the time Coblens acquired Metal Glass such company was unable to pay its debts as they matured and was involved in a reorganization proceeding under Chapter 11 of the Bankruptcy Act. It seems obvious that although Coblens may have hoped to make a success of the business there could be no real assurance that such success would be accomplished. Thus, the assured benefit to Coblens in acquiring the petitioner would *166 be the utilization of its net operating losses, whereas the business benefit, that is, aiding in the operation of Metal Glass, was problematical. There is no affirmative testimony whatsoever that at the time of the acquisition of control of petitioner Coblens did not intend to utilize the claimed net operating losses in the manner ultimately accomplished, that is, by merger of the petitioner with Republic and the utilization of such claimed net operating losses to offset income principally attributable to the assets which Republic 821 brought into the merger. [8] *168 Moreover, we note that in the agreement of January 13, 1960, whereby Coblens acquired the stock of petitioner and Metal Glass from Barler Metal Products, Inc., it was specifically provided that "Barler further warrants that it has not taken nor will it take any action which has affected or may affect the rights of Metal-Glass and/or Hart to carry forward their respective net operating losses to the extent permitted by the Internal Revenue Code." To us this is significant. It tends to indicate that one of the purposes for the acquisition of the petitioner was to obtain the benefit of a deduction of the petitioner's claimed net *167 operating losses. Of course, this does not necessarily establish that tax aviodance was the principal purpose of the acquisition. See Berland's Inc. of South Bend, 16 T.C. 182. However, the petitioner has not adduced evidence sufficient to persuade us that such was not the principal purpose. In none of the testimony is there any explanation of the reason for including the above provision in the contract or of the importance which Coblens attached thereto. Insofar as the record shows, Coblens, in acquiring control of petitioner, may well have had a tax avoidance purpose which outranked or exceeded in importance any other purpose. It is true that Coblens testified that in operating Metal Glass he became doubtful as to the ability of that company to pay rent and thereby permit petitioner to meet its obligations in regard to the mortgage on its property, and that Republic was merged into petitioner to strengthen it and enable it to retain its building. This would seem to imply that the purpose to merge Republic into petitioner was not conceived until after petitioner had been acquired. However, we think the evidence is insufficient to establish that this was so. Coblens testified that he considered the petitioner a good investment, largely because of the building which it owned. However, there is no evidence to show that petitioner could not have leased its building *169 to someone else for a rental sufficient to meet its obligations. We note that even though Coblens sold his interest in Metal Glass in September 1961, and even though Metal Glass went out of business in February or March 1963, petitioner continued to receive rent, the rental amounting to over $50,000 during the taxable year ended September 30, 1964. Furthermore, if Coblens did have doubts as to the ability of Metal Glass to continue paying the rent and doubts as to whether the building could be rented to any one else for a sufficient amount to meet its obligations, the question immediately arises as to what purpose there remained, after having decided to dispose of Metal Glass, for retaining the petitioner with an asset of such doubtful value except that of utilizing the petitioner's net operating losses. Under the circumstances we cannot accept at face value Coblens' testimony that his reason for merging Republic into petitioner was to strengthen the latter to permit it to retain its building and the implication in such testimony that the merger was not conceived until after the petitioner had been acquired. In view of the foregoing it is our conclusion that the petitioner has not *170 carried its burden of proving that the respondent erred in determining that the control of petitioner was acquired for the purpose proscribed by section 269(a) of the Code, and we therefore approve the respondent's disallowance of the claimed net operating loss deductions. [9] In view of our holding that the petitioner has not shown error in the respondent's determination that section 269 applies to disallow the deduction of the claimed net operating losses, it becomes unnecessary to determine whether such deduction would be disallowed under section 382(a) of the Code. Nor is it necessary to determine 822 whether the principle of the Libson Shops case has any application here. On September *171 29, 1961, the petitioner transferred to Thur Schmidt for $1 the 13,802 shares of common stock of Metal Glass which it had acquired in the "recapitalization" of May 1961, in exchange for the note of Metal Glass (then in the amount of $106,771.11) and 625 shares of Metal Glass common stock which it carried on its books at $53,700.92. On its return for the taxable year ended September 30, 1961, it claimed a long-term capital loss of $160,471.03 on such transaction, which resulted in the reporting of a net capital loss of $70,244.68 for that year which was carried over and applied as a net short-term capital loss for each of the taxable years ended September 30, 1962, 1963, and 1964. (See section 1212 of the Code.) The respondent disallowed the claimed capital loss for the taxable year ended September 30, 1961, and accordingly held that there were no capital loss carryovers from that year to the following years. The respondent's determination is presumed to be correct, and the burden of proof is upon the petitioner to show that it is entitled to the claimed deductions and the amounts thereof. Burnet v. Houston, 283 U.S. 223. On brief the respondent contends that the petitioner has failed *172 to establish that it is entitled to the claimed deductions. We agree with the respondent. The note in question was received by petitioner from Metal Glass on or about March 19, 1958 (then in the amount of $109,653.98), as part of the consideration for the transfer by the petitioner of its inventories of materials and work in process. The 625 shares of preferred stock of Metal Glass was received by petitioner on March 26, 1959 as part of the consideration for the transfer by petitioner to Metal Glass of its machinery and equipment. The petitioner contends that on an exchange of assets the assets received take a basis of the value of the property exchanged, that here the assets exchanged had a value in excess of the face amount of the note and the value of $53,700.92 assigned to the preferred stock, and that hence thereafter the note then acquired a basis of $109,653.98 and the stock acquired a basis of $53,700.92. It further contends that at the time of the recapitalization in May 1961, when it surrendered the note (then in the amount of $106,771.11) and the preferred stock in exchange for 13,802 shares of common stock of Metal Glass the comon stock then acquired a basis of $160,472.03, *173 apparently on the ground that that amount represented the fair market value of the note and the preferred stock. It therefore contends that when such common stock was sold to Thur Schmidt on September 29, 1961, for $1 it sustained a capital loss of $160,471.03. It is true that in the case of an arm's length transaction the value of property received in an exchange is generally considered as being equal to the value of the property exchanged, that such value is taken into account in calculating gain or loss, and that the property received takes such value as its basis. However, where, as here, the two parties to the exchange are both owned by the same interest this is not necessarily so. In the instant case Metal Glass was in poor financial condition. On August 11, 1958, it filed a petition for a Chapter 11 reorganization under the Bankruptcy Act. Pursuant to the arrangement accepted by the bankruptcy court on January 5, 1959, the petitioner's note (then in the amount of $108,162.31) was subordinated to the claims of all unsecured creditors and, while provision was made to pay off such unsecured creditors at the rate of 60 cents on the dollar, there was no provision made for the payment *174 of the petitioner's claim. Later, on November 6, 1959, a new plan was proposed, which was confirmed on February 29, 1960, whereby the arrangement was altered to pay the unsecured creditors 25 1/2 cents on the dollar, again no provision being made for the payment of the petitioner's note. It appears obvious upon its receipt by the petitioner the note was worth far less than its face value. Furthermore, since the preferred stock which was issued to petitioner while Metal Glass was still in the bankruptcy court was subordinate to any claims of creditors, it may well be that its actual fair market value was far less than the amount assigned to it by the petitioner. Insofar as has been shown, the transactions by which the petitioner acquired the note and the preferred stock were taxable transactions and were so treated by the petitioner. In a taxable transaction any property received in exchange should be included in the computation of gain or loss at fair market value, and such property acquires as a basis such fair market value. Upon the record presented we are unable to determine the fair market value of the note and the preferred stock when received by 823 the petitioner, [10] *176 and hence *175 cannot determine their basis for purposes of calculating gain or loss upon their exchange for the 13,802 shares of common stock of Metal Glass in connection with the "recapitalization" in May 1961. Apparently the petitioner does not contend that such exchange was a tax free exchange pursuant to a reorganization, within the meaning of section 354 of the Code, and we find it unnecessary to decide that question. If it was a tax free exchange the basis of the 13,802 shares of common stock would be determined by reference to the basis of the note and the preferred stock, which, as stated has not been shown. If, on the other hand, the exchange was a taxable transaction the basis of the 13,802 shares of common stock of Metal Glass would be the fair market value thereof, which would be the amount at which such shares would be included in the calculation of gain or loss. Here again we are unable to determine from this record the fair market value of the 13,802 shares of common stock at the time of the exchange, [11] and hence cannot determine the amount of loss, if any, sustained upon their sale to Thur Schmidt on September 29, 1961 for $1. We therefore cannot find that petitioner sustained the capital loss claimed and the resulting claimed net capital loss. Accordingly, we approve the respondent's disallowance of the claimed capital loss for the taxable year ended September 30, 1961, and the claimed capital loss carryovers to *177 the taxable years ended September 30, 1962, 1963, and 1964. During each of its taxable years ended September 30, 1961, 1962, 1963, and 1964 the petitioner claimed as a deduction an amount of $1,476 as "patent amortization." The respondent disallowed the deduction for each year. The burden of proof was upon the petitioner to show that it was entitled to such deductions. Section 167 of the Internal Revenue Code of 1954 provides for the allowance as a depreciation deduction of a reasonable allowance for exhaustion, wear and tear of property used in the trade or business or of property held for the production of income. On brief the respondent in support of his determination contends that the patents were not used in petitioner's trade or business or held for the production of income, that the petitioner has not attempted to prove the basis of any of the patents, and that the failure of the petitioner to use any of the patents over a long period of time indicates that they were worthless. These patents had been carried on the petitioner's books for a number of years at a cost of $25,000, and depreciation had been taken at an annual rate of $1,476 prior to the time Coblens acquired the *178 stock of petitioner. Depreciation up to that time had been claimed in the amount of $12,460.50. The only evidence presented as to the patents was the testimony of Coblens who stated that he thought that the patents had value and that he hoped to exploit them, particularly one for a specially designed wheelbarrow, but that so far he had not "gotten around to it." He stated that he was not as familiar with the other patents as he was with the wheelbarrow patent. Upon this meager showing, we cannot conclude that the respondent's determination was erroneous. There is no evidence as to how many patents are involved or as to their nature, except for the patent on the wheelbarrow, as to their basis or as to their useful life. Furthermore, it seems apparent that they were not used in the petitioner's trade or business and we are not satisfied that they were, in the years in question, held for the production of income. It may be added that there is no evidence to show that petitioner ever derived any income from the patents. The respondent's determination in this respect is approved. The petitioner reported rental income of $43,200 for its taxable year ended September 30, 1961. The respondent *179 determined that the petitioner had rental income of $51,002.66 in that year. Here again we are unable to determine from the evidence presented that the respondent was in error. While the evidence indicates that in the early part of 1961 petitioner's property was rented to Metal Glass at a rental of $3,600 per month, which was the rent which the 824 bankruptcy court had approved when Metal Glass was involved in the reorganization under Chapter 11 of the Bankruptcy Act, there is no evidence directed toward proving that in fact the petitioner did not receive $51,002.66 of rent in that year as determined by the respondent. It may be further added that although the petitioner on brief refers to the amount of $43,200 as representing the rent for such year, there is no detailed discussion in justification of using that figure rather than the amount determined by the respondent. Under the circumstances, we must approve the respondent's determination in this respect. In its petition the petitioner also alleged error on the part of the respondent in disallowing certain legal expenses claimed as deductions for the taxable years ended September 30, 1961 and 1963, and certain deductions claimed *180 as taxes paid in the taxable years ended September 30, 1962 and 1963. However, no evidence was adduced with respect to these issues and they are not mentioned by the petitioner on brief. Under the circumstances, we assume that the issues have been abandoned and the respondent's determination in these respects will not be disturbed. The respondent determined that the petitioner was liable for deficiencies in personal holding company tax under section 541 of the Internal Revenue Code, [12] *181 for each of the taxable years ended September 30, 1961, 1963, and 1964. (The personal holding company provisions referred to herein are those existing in, and applicable to, the taxable years here in question.) Section 542 defines a personal holding company as a corporation at least 80 percent of whose income for the taxable year is personal holding company income as defined in section 543. Section 543 provides that the term "personal holding company income" means the portion of the gross income which consists among other things of dividends, interest, gains from the sale or exchange of stock or securities, and rents (unless such rents constitute 50 percent or more of the gross income). In view of our conclusion hereinabove that the petitioner is not entitled to the claimed long-term capital loss for the taxable year ended September 30, 1961, and as a consequence is not entitled to capital loss carryovers to the taxable years ended September 30, 1963, and 1964, it is apparent that rents did not constitute as much as 50 percent of the petitioner's gross income for those years. Therefore the rents are to be treated as personal holding company income, with the result that in each of the taxable years ended September 30, 1961, 1963, and 1964 more than 80 percent of its gross income was personal holding company income. [13] In such years the petitioner *182 was therefore a personal holding company. The petitioner also contends that in computing its undistributed personal holding company income the respondent erred in failing to allow as a deduction, pursuant to section 545 of the Code, [14] *184 Federal income 825 taxes (not including any personal holding company tax) accrued during each of the taxable years ended September 30, 1961, 1963, and 1964. Specifically, the petitioner contends that the deficiency in Federal income tax determined by the respondent *183 for each of the taxable years ended September 30, 1961, 1963, and 1964 must be considered as having accrued during such taxable year within the meaning of section 545 of the Code. The respondent, on the other hand, contends that an unpaid tax which is being contested is not considered accrued until the contest is resolved, citing Dixie Pine Products Co. v. Commissioner, 320 U.S. 516, and section 1.545-2(a)(1)(i) of the Income Tax Regulations.[15] He points out that the petitioner has never admitted liability for Federal income taxes for the years in question and that before this Court it continues to deny liability for any such taxes. The petitioner argues that Dixie Pine Products Co., supra, is not in point, since there the tax liability was being contested by the taxpayer in the year in which it was claimed the liability accrued. It is its position that there was, in the years in question, no contest with regard to any Federal tax liability for such years - that no contest *185 or dispute arose until a later year when the respondent determined the deficiencies. It states that all the events which fixed the fact and the amount of tax liability occurred during the taxable years involved, and that since respondent's determination is presumed to be correct each deficiency determined must be treated as having accrued during the year to which the deficiency applies "until this Court decides this case in Petitioner's favor." Under the Internal Revenue Code of 1939, and the revenue acts immediately preceding it, the income upon which the personal holding company surtax was imposed was computed by deducting "Federal income, war-profits and excess-profits taxes paid or accrued during the taxable year" (emphasis supplied). In enacting section 545 of the Internal Revenue Code of 1954, Congress changed the statute to provide that the income upon which the personal holding company tax is imposed is computed by deducting Federal income and excess profits taxes "accrued during *186 the taxable year" (emphasis supplied). With respect to this change H. Rept. No. 1337, 83rd Cong., 2nd Sess., contains the following at pages 56 and A176: In the computation of undistributed income subject to the personal holding company tax, the deduction for taxes has been clarified to provide that taxes are to be deducted when accrued. Under existing law there has been considerable confusion as to whether taxes may be deducted in the year paid or in the year accrued. The bill permits taxpayers who have been deducting taxes when paid to continue to do so but such taxpayers may, if they so desire, make an irrevocable election at any time to change to the accrual method. * * * The changes made in existing law include (a) an allowance of the deduction only in the taxable year in which such taxes accrue * * *. In allowing a deduction only for taxes accrued, the committee recognizes that some corporations on the cash basis have consistently deducted, in returns filed for prior taxable years, only those taxes which have been paid during such years. Such corporations may continue to so deduct only the taxes paid during the taxable year. However, such a corporation may deduct only the taxes *187 accrued during the taxable year if it so elects on its return filed for such year. An election once made in a return is irrevocable for such year and the accrual method of deducting taxes applies to all subsequent taxable years. In the case of contested taxes the accrual occurs in the year the contest is resolved ( Dixie Pine Products Co. v. Commissioner, 320 U.S. 516). Substantially the same language appears in S. Rept. No. 1622, 83rd Cong., 2nd Sess., at pages 74 and 320. Clearly then, section 1.545-2(a)(1)(i) of the Income Tax Regulations reflects the Congressional intent in providing that in computing the amount of taxes accrued, an unpaid tax which is being contested is not considered as accrued until the contest is resolved. It is true, as pointed out by the petitioner, that in the Dixie Pine Products Co. case the state excise tax there in question was being actively contested during the taxable year in which the taxpayer claimed that it accrued. However, it seems obvious that Congress did not intend to restrict the principle of that 826 case to that precise situation. By the very nature of the taxes to which Congress was addressing itself, including the Federal income tax, *188 there could be no active contest within the taxable year for which the tax is imposed since income tax returns are not filed until the year following the year with respect to which such taxes are imposed. Here the petitioner in its returns for the taxable years ended September 30, 1961, 1963, and 1964 showed no Federal income tax due. Later, after the respondent determined deficiencies in Federal income tax for those years, the petitioner filed its petition herein contesting the determination. Under the circumstances it is our opinion that it cannot be considered that any Federal income taxes for the taxable years ended September 30, 1961, 1963, and 1964 accrued during those years within the meaning of section 545. None of such taxes may be considered as accrued until the present contest is resolved. The petitioner has cited, in support of its contention that the existence of a later contest does not affect the accrual of tax liability in prior years, Keller-Dorian Corporation v. Commissioner, (C.A. 2, 1946) 153 F. 2d 1006, affirming a Memorandum Opinion of this Court, and Japanese Trading Co., Ltd., T.C. Memo. 1966-78. We do not consider either of those cases as being apposite. Each *189 involved the year of accrual of customs duties and each referred to 19 U.S.C.A., section 1001, which specifically provides that the liability of an importer for customs duties accrues when the goods arrive at the port of entry. Neither case involved the year of accrual of Federal income taxes for purposes of computing income subject to the personal holding company tax. As stated above, we think Congress had clearly indicated its intention that for present purposes Federal income taxes which are contested after the year for which they are imposed do not accrue until the contest is resolved. We accordingly hold that in computing the petitioner's undistributed personal holding company income for the taxable years ended September 30, 1961, 1963, and 1964 the petitioner is not entitled to deduct any Federal income taxes for those years. In its petition the petitioner alleged as error the respondent's failure, in computing the petitioner's undistributed personal holding company income for the taxable years ended September 30, 1961, 1963, and 1964, to allow a deduction for dividends received for such years. However, on brief the petitioner makes no mention of this issue, and we conclude that *190 it has been abandoned. In any event, section 545(b)(3) of the Code specifically provides that in computing the undistributed personal holding company income the special deductions provided elsewhere in the Code for dividends received by corporations shall not be allowed. Decision will be entered for the respondent. Footnotes
1. The deficiencies for the taxable years ended September 30, 1961, 1963, and 1964 included deficiencies in personal holding company tax in the respective amounts of $41,950.97, $12,986.91, and $9,418.68.↩
2. The respondent determined a deficiency of $6,513.10 against the petitioner for the taxable year ended September 30, 1960, based upon the disallowance of a claimed net operating loss deduction of $225,732.16 (made up of the remaining portion of the claimed net operating loss for the taxable year ended September 30, 1957, and the claimed net operating losses for the taxable years ended September 30, 1958 and 1959), the disallowance of a deduction of $1,476 claimed as amortization of patents, and the disallowance of certain bad debt deductions. The respondent disallowed the claimed net operating loss deduction under section 269 of the Code, since he determined that Coblens acquired all the stock of the petitioner to evade or avoid income tax. The respondent disallowed the patent amortization deduction stating that it was not allowable under section 269↩ or any other section. The petitioner filed a petition with this Court (Docket No. 1355-64) alleging error in these respects. The respondent filed an answer denying error. No trial was had, no stipulations of fact or briefs were filed, and no argument was had before this Court. Rather, the parties agreed, for reasons undisclosed, that this Court might enter a decision of no deficiency for the taxable year ended September 30, 1960, and such a decision was entered on October 25, 1965.
*. As hereinbefore stated, for its taxable year ended September 30, 1961, petitioner claimed a long-term capital loss of $160,471.03 on the sale of common stock of Metal Glass, resulting in the reporting of a net capital loss for that year of $70,244.68. The claimed net capital loss reported for that year was carried over to the taxable years ended September 30, 1962, 1963 and 1964 for which years the petitioner reported net capital gains (before application of the capital loss carryover) of $3,887.14, $46,150.47 and $31,191.95, respectively.↩
3. Section 269 of the Code provides in part as follows: ACQUISITIONS MADE TO EVADE OR AVOID INCOME TAX. (a) In General. - If - (1) any person or persons acquire, or acquired on or after October 8, 1940, directly or indirectly, control of a corporation, or (2) any corporation acquires, or acquired on or after October 8, 1940, directly or indirectly, property of another corporation, not controlled, directly or indirectly, immediately before such acquisition, by such acquiring corporation or its stockholders the basis of which property, in the hands of the acquiring corporation, is determined by reference to the basis in the hands of the transferor corporation, and the principal purpose for which such acquisition was made is evasion or avoidance of Federal income tax by securing the benefit of a deduction, credit, or other allowance which such person or corporation would not otherwise enjoy, then the Secretary or his delegate may disallow such deduction, credit, or other allowance. For purposes of paragraphs (1) and (2), control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the corporation. * * * (c) Presumption in Case of Disproportionate Purchase Price. - The fact that the consideration paid upon an acquisition by any person or corporation described in subsection (a) is substantially disproportionate to the aggregate - (1) of the adjusted basis of the property of the corporation (to the extent attributable to the interest acquired specified in paragraph (1) of subsection (a)), or of the property acquired specified in paragraph (2) of subsection (a); and (2) of the tax benefits (to the extent not reflected in the adjusted basis of the property) not available to such person or corporation otherwise than as a result of such aquisition, shall be prima facie evidence of the principal purpose of evasion or avoidance of the Federal income tax. This subsection shall apply only with respect to acquisitions after March 1, 1954. Section 382 of the Code provides in part as follows: SPECIAL LIMITATIONS ON NET OPERATING LOSS CARRYOVERS. (a) Purchase of a Corporation and Change in Its Trade or Business. - (1) In General. - If at the end of a taxable year of a corporation - (A) any one or more of those persons described in paragraph (2) [such persons being the 10 or lesser number owning the greater percentage of the fair market value of the stock at the end of a taxable year] own a percentage of the total fair market value of the outstanding stock of such corporation which is at least 50 percentage points more than such person or persons owned at - (i) the beginning of such taxable year, or (ii) the beginning of the prior taxable year, (B) the increase in percentage points at the end of such taxable year is attributable to - (i) a purchase by such person or persons of such stock, the stock of another corporation owning stock in such corporation, or an interest in a partnership or trust owning stock in such corporation, or (ii) a decrease in the amount of such stock outstanding or the amount of stock outstanding of another corporation owning stock in such corporation, except a decrease resulting from a redemption to pay death taxes to which section 303 applies, and (C) such corporation has not continued to carry on a trade or business substantially the same as that conducted before any change in the percentage ownership of the fair market value of such stock, the net operating loss carryovers, if any, from prior taxable years of such corporation to such taxable year and subsequent taxable years shall not be included in the net operating loss deduction for such taxable year and subsequent taxable years.↩
4. Section 172 of the Code provides in part as follows: NET OPERATING LOSS DEDUCTION. (a) Deduction Allowed. - There shall be allowed as a deduction for the taxable year an amount equal to the aggregate of (1) the net operating loss carryovers to such year, plus (2) the net operating loss carrybacks to such year. * * * * * * (B) * * * a net operating loss for any taxable year ending after December 31, 1955, shall be a net operating loss carryover to each of the 5 taxable years following the taxable year of such loss.↩
5. Congress intended section 269 to "be operative only if the evasion or avoidance purpose outranks, or exceeds in importance, any other one purpose." S. Rept. No. 627, 78th Cong., 1st Sess., p. 59. Section 1.269-3(a)(2) of the Income Tax Regulations provides in part: If the purpose to evade or avoid Federal income tax exceeds in importance any other purpose, it is the principal purpose. This does not mean that only those acquisitions fall within the provisions of section 269↩ which would not have been made if the evasion or avoidance purpose was not present. * * *
6. S. Rept. No. 1622, 83d Cong., 2d Sess., p. 228, states in part: This presumption would arise where the consideration paid upon an acquisition is substantially less than the aggregate of - (1) the adjusted basis of the property of the corporation (to the extent attributable to the interest acquired specified in paragraph (a)(1)) or of the property acquired specified in paragraph (a)(2); and (2) the tax benefits (to the extent not reflected in the adjusted basis of the property) not available otherwise than as a result of the acquisition. ↩
7. Section 1.269-5 provides in part as follows: Section 269(c) provides that the fact that the consideration paid upon an acquisition by any person or corporation described in section 269(a) is substantially less than the aggregate - (a) Of the adjusted basis of the property of the corporation (to the extent attributable to the interest acquired specified in paragraph (1) of section 269(a); * * * and (b) Of the tax benefits (to the extent not reflected in the adjusted basis of the property) not available to such person or corporation otherwise than as a result of such acquisition, shall be prima facie evidence of the principal purpose of evasion or avoidance of Federal income tax. * * * The effect of section 269(c)↩, if applicable, is to give further weight to the presumption of correctness already arising from the Commissioner's determination, by expressly providing an additional presumption of the existence of a principal purpose of evasion or avoidance of Federal income tax. * * *
8. It may be pointed out that the situation here presented is of the type described in section 1.269-3(b)(1) of the Income Tax Regulations as follows: Acquisition of control; transactions indicative of purpose to evade or avoid tax. If the requisite acquisition of control within the meaning of paragraph (1) of section 269(a) exists, the transactions set forth in the following subparagraphs are among those which, in the absence of additional evidence to the contrary, ordinarily are indicative that the principal purpose for acquiring control was evasion or avoidance of Federal income tax: (1) A corporation or other business enterprise (or the interest controlling such corporation or enterprise) with large profits acquires control of a corporation with current, past, or prospective credits, deductions, net operating losses, or other allowances and the acquisition is followed by such transfers or other action as is necessary to bring the deduction, credit or other allowance into conjunction with the income * * *.↩
9. Section 269(b)↩ of the Code provides that in any case to which subsection (a) applies the Secretary or his delegate is authorized to allow as a deduction any part of any amount disallowed by subsection (a) if he determines that such allowance will not result in the evasion or avoidance of Federal income tax for which the acquisition was made. The respondent did not here exercise such authority and allow any part of the claimed net operating loss deductions, and no issue has been raised in this regard.
10. Indeed, the record does not disclose the value at which the petitioner may have included the note and the preferred stock in its computation of gain or loss in its taxable years ended September 30, 1958 and 1959, respectively. We note that upon the transfer of machinery and equipment on March 26, 1959, Metal Glass assumed a chattel mortgage of $108,972.20. Since, in its return, petitioner reported a gross sales price of $131,699.60 for "Machinery and equipment," it seems obvious thaat the preferred stock was not included at the amount of $53,700.92. 11. In this connection it may be pointed out that Coblens testified that on September 29, 1961, Metal Glass had a net worth, according to its books, of about $30,000. Such book value would not, of course, establish the fair market value of the common stock at the date of the exchange in May 1961, although it might tend to indicate that the common stock had some fair market value on September 29, 1961.↩
12. Section 541provides: IMPOSITION OF PERSONAL HOLDING COMPANY TAX. In addition to other taxes imposed by this chapter, there is hereby imposed for each taxable year on the undistributed personal holding company income (as defined in section 545) of every personal holding company (as defined in section 542) a personal holding company tax equal to the sum of - (1) 75 percent of the undistributed personal holding company income not in excess of $2,000 plus (2) 85 percent of the undistributed personal holding company income in excess of $2,000.↩
13. Giving effect to our decisions hereinabove, the petitioner's gross income for the taxable year ended September 30, 1961 is $159,886.36 and its rental income is $51,002.66. Its income from capital gains, interest, and dividends totals $108,782.12 which, together with the rental income, totals $159,784.78, which is more than 80 percent of its gross income. Petitioner's gross income for its taxable year ended September 30, 1963 is $117,793.76 and its rental income is $37,943.33. Petitioner's gross income for its taxable year ended September 30, 1964 is $118,938.07 and its rental income is $50,190.98. During such two years all its other income consisted of capital gains, interest, and dividends.↩
14. Section 545 provides in part as follows: UNDISTRIBUTED PERSONAL HOLDING COMPANY INCOME. (a) Definition. - For purposes of this part, the term "undistributed personal holding company income" means the taxable income of a personal holding company adjusted in the manner provided in subsection (b), minus the dividends paid deduction as defined in section 561. (b) Adjustments to Taxable Income. - For the purposes of subsection (a), the taxable income shall be adjusted as follows: (1) Taxes. - There shall be allowed as a deduction Federal income and excess profits taxes * * * accrued during the taxable year * * * not including the accumulated earnings tax imposed by section 531, the personal holding company tax imposed by section 541, or the taxes imposed by corresponding sections of a prior income tax law. A taxpayer which, for each taxable year in which it was subject to the tax imposed by section 500 of the Internal Revenue Code of 1939, deducted Federal income and excess profits taxes when paid for the purpose of computing subchapter A net income under such Code, shall deduct taxes under this paragraph when paid, unless the taxpayer elects, in its return for a taxable year ending after June 30, 1954, to deduct the taxes described in this paragraph when accrued. Such an election shall be irrevocable and shall apply to the taxable year for which the election is made and to all subsequent taxable years.
15. Such section of the regulations provides in part as follows: In computing the amount of taxes accrued, an unpaid tax which is being contested is not considered accrued until the contest is resolved.↩